RHODE ISLAND HIGHER EDUCATION ASSISTANCE AUTHORITY, Plaintiff, Appellee,

v.

SECRETARY, U.S. DEPARTMENT OF EDUCATION, et al., Defendants, Appellants.

No. 90–2118.

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1991.

Decided April 5, 1991.

---

Neil H. Koslowe, Special Litigation Counsel, Civil Div., U.S. Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Lincoln C. Almond, U.S. Atty., Providence, R.I., William Kanter, Deputy Director, Edward C. Stringer, Gen. Counsel, U.S. Dept. of Educ., Harold Jenkins and Brian Siegel, Attys., Dept. of Educ., Washington, D.C., were on brief for defendants, appellants.

Joseph R. Palumbo, Jr., with whom Palumbo, Galvin & Boyle, Middletown, R.I., was on brief, for plaintiff, appellee.

Before TORRUELLA, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

This appeal requires that we consider, for the first time, whether the 1987 amendments to the Higher Education Act of 1965 (the Act), codified as amended at 20 U.S.C. §§ 1071–1098 (1988), can be applied to alter preexisting contractual rights conferred by the Act. The United States District Court for the District of Rhode Island said that the amendments could not be so utilized. *Rhode Island Higher Educ. Assistance Auth. v. Cavazos*, 749 F.Supp. 414 (D.R.I. 1990) (*RIHEAA I*). We disagree, thus aligning ourselves with several of our sister circuits. *See, e.g., Great Lakes Higher Educ. Corp. v. Cavazos*, 911 F.2d 10, 16–17 (7th Cir.1990); *Education Assistance Corp. v. Cavazos*, 902 F.2d 617, 628–30 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990); *Ohio Student Loan Comm'n v. Cavazos*, 900 F.2d 894, 901–02 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 245, 112 L.Ed.2d 203 (1990); *South Carolina State Educ. Assistance Auth. v. Cavazos*, 897 F.2d 1272, 1276–77 (4th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 243, 112 L.Ed.2d 202 (1990); *see also Delaware v. Cavazos*, 723 F.Supp. 234, 241–42 (D.Del.1989), *aff'd without opinion,* 919 F.2d 137 (3d Cir.1990). Consequently, we hold that the Secretary of Education lawfully relied upon the 1987 amendments both in issuing a transfer-of-funds directive to plaintiff-appellee Rhode Island Higher Education Assistance Authority (RIHEAA) and in enforcing the directive by diverting payments otherwise due, notwithstanding the effect of those actions on RIHEAA's preexisting rights to reimbursement.

Our odyssey does not end at that point, for the district court grounded its judgment on alternative holdings. Perscrutation of the record convinces us that the second ground relied on below—the Secre-

tary of Education's supposedly "arbitrary" failure to grant RIHEAA a discretionary waiver relieving it from the amendments' operation, *RIHEAA I*, 749 F.Supp. at 427—is also unsupportable. Concluding, as we do, that the waiver question should have been more fully explored at the administrative level, we vacate the judgment and order that the case be remanded to the Secretary for further consideration of RIHEAA's waiver request.

## I. BACKGROUND

The facts of this case are comprehensively set forth in the lower court's opinion, *id.* at 415–19, and it would be pleonastic to rehearse them in great detail. Hence, we limn only those facts needed to place the issues on appeal into satisfactory context.

Congress enacted the first version of the Act, establishing the Guaranteed Student Loan Program (GSLP), Pub.L. No. 89–329, 79 Stat. 1232 (1965), in order to make higher education more widely accessible to the populace. To achieve this end, Congress chose to encourage States to implement tuition insurance programs (or, alternatively, to strengthen programs already in existence). S.Rep. No. 673, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 4027, 4061–62. The GSLP began with the premise that private lenders would offer student loans at below-market interest rates if the loans were guaranteed; and, from that premise, proceeded to facilitate the provision of such guarantees. *See generally Citizens Savings Bank v. Bell*, 605 F.Supp. 1033, 1035–36 (D.R.I.1985) (describing GSLP program). The States were accorded some flexibility in fine-tuning the guaranty mechanism. A State desiring to participate in the GSLP could either establish an agency to guarantee student loans, or designate a private, non-profit agency as the surrogate for a governmental unit. Once the guaranty agency was selected, it would enter a series of contracts with the Secretary. The agency would then insure student loans, operating under, and in presumed conformity with, the Act, the con-

tracts, and the extensive program guidelines promulgated by the Secretary. For his part, the Secretary would back the insurance obligations and subsidize interest rates.

In 1977, the Rhode Island General Assembly created RIHEAA, a public corporation, and designated it as the agency in charge of administering the GSLP in Rhode Island.[1] RIHEAA promptly entered into serial contracts with the Secretary, including a Basic Agreement, an Advances Agreement, a Reinsurance Agreement, and a Supplemental Reinsurance Agreement (SRA). Forsaking comprehensiveness, we mention only selected features of these instruments.

The Basic Agreement recognized RIHEAA as Rhode Island's guaranty agency and provided for an interest rate subsidy to lenders receiving RIHEAA's guaranty. The Advances Agreement entitled RIHEAA to cash advances from the Secretary (ultimately to be repaid). The Reinsurance Agreement, as modified by the SRA, committed the Secretary to reimburse RIHEAA for between 80% and 100% of the losses incurred in meeting its guaranty obligations on defaulted loans (the precise level of reimbursement being dependent on RIHEAA's success in controlling the default rate on the loans which it insured). The Basic Agreement and Reinsurance Agreement each stated that the parties "shall be bound by all changes in the Act or regulations in accordance with their respective effective dates." The agreements also contained language to the effect that, if RIHEAA failed "to comply with any of the [agreements'] provisions ... or applicable Federal law or regulations," the Secretary could withhold reimbursement payments otherwise due. Finally, consistent with 34 C.F.R. § 682.414(b), the agreements obligated RIHEAA to submit detailed financial statements to the Secretary on a regular basis.

After these documents were executed, RIHEAA operated as the State's GSLP guaranty agency. Pursuant to that role,

---

1. Prior to 1977, Rhode Island's state-sponsored agency was the Rhode Island Higher Education Assistance Corporation. The reasons for the changeover are immaterial to our inquiry.

RIHEAA entered into guaranty agreements with participating lenders. Generally, these agreements required it to maintain a reserve fund equal to no less than 1% of the aggregate principal balance of all outstanding student loans insured by it. In separate guaranty agreements with (1) lenders participating in the federal Parent Loan for Undergraduate Students (PLUS) Program and (2) the Rhode Island Student Loan Authority (RISLA), RIHEAA pledged to maintain a reserve fund equal to 2% of that balance.

For federal accounting purposes, a guaranty agency's reserve fund is comprised of its cash assets. *See* 34 C.F.R. § 682.410(a)(1). Federal regulations prohibit the use of these assets for purposes other than those associated with the GSLP. *See* 34 C.F.R. § 682.410(a)(2). In RIHEAA's case, its reserve fund consisted of guaranty fees charged to lenders, a lump sum inherited from its predecessor agency, *see supra* note 1, collections from defaulted borrowers, federal advances, reinsurance payments, and administrative cost allowances.

Administrative cost allowances are paid by the Secretary to guaranty agencies to help offset operating costs. *See* 20 U.S.C. § 1078(f). In 1986, Congress made these allowances mandatory and conferred upon the guaranty agencies a "contractual right" to receive the allowances. *Id.* at § 1078(f)(1)(B). At the same time, Congress ceded a similar contractual right to the guaranty agencies respecting reinsurance payments:

> The Secretary may enter into a guaranty agreement with any guaranty agency, whereby the Secretary shall undertake to reimburse it, under such terms and conditions as the Secretary may establish, with respect to losses (resulting from the default of the student borrower) on the unpaid balance of the principal and accrued interest of any insured loan,.... The guaranty agency shall be deemed to have a contractual right against the United States, during the life of such loan, to receive reimbursement according to the provisions of the subsection.

20 U.S.C. § 1078(c)(1)(A). It is this statutorily created "contractual right" which RIHEAA contends was unlawfully abrogated by the Secretary's retrospective application of the 1987 amendments to the Act, to which we now turn.

In 1987, Congress received a Comptroller General's report suggesting that guaranty agencies across the country had accummulated huge cash reserves, not necessary for the due accomplishment of program-related objectives. *See* H.R.Conf.Rep. No. 495, 100th Cong., 1st Sess. 518, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–1264. Some of these funds were apparently being used for forbidden purposes. The Comptroller General recommended, therefore, that Congress set limits on the funds that a guaranty agency could keep in reserve, so that the amount held by each agency would correspond to the financial risks it faced in connection with its activities under the GSLP umbrella. Congress addressed this problem in the Omnibus Budget Reconciliation Act (OBRA), Pub.L. No. 100–203, 101 Stat. 1330 (1987), limiting the amount of cash reserves that state-sponsored guaranty agencies could accumulate. The legislative formula for determining the maximum reserve maintainable was geared to an agency's financial condition at the end of the 1986 fiscal year. *See* 20 U.S.C. § 1072(e).[2] An agency holding cash reserves in excess of the formulaic ceiling was obliged to transfer the surplus to the Secretary in order to defray certain program-related costs. *See* 20 U.S.C. § 1081. In the same vein, OBRA also modified 20 U.S.C. § 1078 by conditioning an agency's "contractual right" to administrative cost allowances and reimbursement payments on compliance with the transfer requirements of section 1072(e).

The obligation to transfer surplus funds was not absolute. A guaranty agency could request that the requirement be waived. *See* 20 U.S.C. § 1072(e)(3)(A).

---

**2.** Section 1072(e) was not meant to effect a permanent programmatic change. Its provisions expired automatically on September 30, 1989.

Waivers were to be authorized in three sets of circumstances: (1) if the agency's financial position had deteriorated significantly; (2) if substantial changes in economic circumstances (or in the loan program itself) rendered the maximum reserve level inadequate; or (3) if the transfer would compel the agency to violate contractual obligations requiring the maintenance of specific levels of reserves. *Id.* Absent a waiver, however, the Secretary was authorized to enforce the transfer of excess reserves by any of several methods, including the withholding of reimbursement payments otherwise due. 20 U.S.C. § 1072(e)(2).

In February 1988, based upon financial data reported by RIHEAA concerning its finances in fiscal 1986 and 1987,[3] the Secretary notified the agency of his determination that the amount of its excess reserves was $6,740,725. RIHEAA did not dispute the calculation, but requested a waiver based on all three grounds contemplated in section 1072(e)(3)(A). After the Secretary denied this request, RIHEAA took a different tack. It again requested a waiver, this time claiming a mistake; the financial data previously supplied by it (and certified as correct) was, RIHEAA said, substantially inflated. After receiving new reports from RIHEAA's auditors, the Secretary denied the second waiver request. Assuming the revised figures to be accurate, he recomputed the excess reserve amount to be $2,785,156 and proceeded to sequester this sum by holding back payments otherwise due.

Displeased, RIHEAA sued the Secretary and the federal Department of Education (DOE) in the district court, seeking to enjoin them from shortstopping further payments and to recover the monies previously withheld. In due course, both sides moved for summary judgment. The district court ruled in the plaintiff's favor, granting the requested injunction and entering a judgment of recoupment in the amount of $2,785,156. This appeal followed.

## II. RETROSPECTIVE ENFORCEABILITY OF THE 1987 AMENDMENTS

The court below concluded that the amendment to 20 U.S.C. § 1078(c)(1)(A), conditioning agencies' contractual rights to reimbursement on compliance with the "reserve transfer" provisions of section 1072(e), impermissibly abrogated RIHEAA's vested right to receive such payments insofar as it attempted to reach reimbursement obligations on loans underwritten before the amendment's effective date:

> The flaw in the Secretary's position is that he fails to distinguish between losses incurred on loans guaranteed by the Authority *before* the 1987 Amendments were adopted and those incurred on loans guaranteed *after* that time. While the new condition regarding "elimination" of "excess" reserves may apply prospectively to loans guaranteed after its enactment, the Secretary does not cite any provision in the Budget Act indicating that Congress intended to apply it retroactively to negate or restrict a guaranty agency's right to reimbursement with loans previously guaranteed.

*RIHEAA I*, 749 F.Supp. at 419. Suggesting that RIHEAA's right to reinsurance payments vested once it guaranteed a loan in reliance on the Secretary's promise to effect reimbursement, the district court ruled that the "retroactive" application of the 1987 amendments deprived RIHEAA of a property interest—the so-called "vested contractual right"—in violation of the fifth amendment. *Id.* at 420, 423.

We need not tarry long over this aspect of the appeal. The issue boils down to whether the 1987 amendments unconstitutionally abridged RIHEAA's contractual right to receive reinsurance payments on loans guaranteed prior to OBRA's effective date. Four of our sister circuits have recently considered the identical question, answered it in the negative, and written at varying lengths on the subject. *See supra* p. 846 (listing cases). All of these courts have concluded that no unconstitutional abridgement occurred. We find these opin-

---

**3.** RIHEAA operated on a fiscal year, ending on September 30.

ions persuasive and see no value in attempting to reinvent so well-fashioned a wheel. We do, however, emphasize a few points.

It is without question that, under appropriate circumstances, a contractual right against the United States can constitute a vested right. *See, e.g., Perry v. United States,* 294 U.S. 330, 351, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935); *Sinking Fund Cases,* 99 U.S. 700, 719, 25 L.Ed. 496, 504 (1879). We find *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), heavily relied upon by the court below, to be an excellent example of the tenet. There, the Court struck down a statute which purported to repeal the government's obligation to pay benefits under a war risk insurance plan, holding that plaintiffs, by paying monthly premiums, had acquired vested rights protected by the fifth amendment. *Id.* at 576–77, 54 S.Ct. at 842–43. *Lynch* and cases like it teach that "Congress does not have the power to repudiate its own debts, which constitute 'property' to the lender, simply in order to save money." *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 55, 106 S.Ct. 2390, 2398, 91 L.Ed.2d 35 (1986).

■ It is clear, nevertheless, that not all contract rights are created equal. The question of whether a statutorily spawned contract right is a vested property right for purposes of the fifth amendment turns on whether Congress reserved power to modify the terms of the contract. *See Education Assistance Corp.,* 902 F.2d at 628. The *Bowen* Court, for example, considered the operation of this principle in a context where States had been participating in the social security system for some time under contracts with the Secretary of Health and Human Services (HHS). The law allowed the States to terminate these arrangements upon giving notice to the Secretary no less than two years in advance. Congress then enacted an amendment which, by its terms, prevented a State from cancelling its contract with HHS even if it had filed a termination notice before passage of the amendment. California, which had previously served notice of an intent to cancel, challenged the amendment. In concluding that the new law did not abrogate the State's vested rights, the Supreme Court reasoned that Congress, in enacting the Social Security Act, anticipated the need to respond to changing conditions and therefore expressly reserved its right to alter, amend, or repeal any provision. Such a reservation necessarily meant that contractual rights arising under agreements executed pursuant to the Act, and which incorporated its language, were not fully vested. *Bowen,* 477 U.S. at 52, 54–55, 106 S.Ct. at 2396, 2397–98.

The *Bowen* Court did not limit its analysis to cases involving express reservations of legislative authority. To the precise contrary, the Justices took pains to warn that, ordinarily, courts should be reluctant to construe an Act of Congress in a manner that would foreclose Congress' sovereign power. *Id.* at 52, 106 S.Ct. at 2396. Because sovereign power is an "enduring presence" that controls all contracts subject to the government's jurisdiction, it " 'remain[s] intact unless surrendered in unmistakable terms.' " *Id.* (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)). Moreover, the presumption favoring preservation of sovereign authority "take[s] on added force when the arrangement pursuant to which the Government is claimed to have surrendered a sovereign power is one that serves to implement a comprehensive social welfare program affecting millions of individuals throughout our Nation." *Id.* 477 U.S. at 53, 106 S.Ct. at 2397.

We believe that *Bowen's* lessons are controlling here. Although Congress did not expressly reserve its right to amend or repeal the Higher Education Act, the *Bowen* factors strongly suggest that such a right was implied. In the first place, nowhere in the Act did Congress hint, let alone state in "unmistakable terms," that it intended to surrender its sovereign power to amend the Act's provisions from time to time, as changing conditions might indicate. In the second place, there is nothing in the structure, content, or language of the Act from which such a surrender can

fairly be inferred. In the third place, the Higher Education Act, and the web of programs emanating from it, fits securely within the sphere where "added force" attends the arguments favoring preservation of sovereign authority. *See id.* After all, like social security although on a smaller scale, the GSLP is a cooperative federal/state program designed to implement a comprehensive set of societal goals:

> [T]he public nature of the reserve funds themselves, coupled with the express contractual reservation of the power to amend the terms of the GSL program and the fact that the legislative changes involve a comprehensive federal/state social welfare program, forecloses a finding that the state agencies have obtained unalterable vested property rights to certain payments.

*South Carolina State Educ. Assistance Auth.*, 897 F.2d at 1277. As a matter of constitutional law, it cannot be said that the contractual right conferred by section 1078(c) amounted to a *vested* right since the Higher Education Act did not unambiguously surrender Congress' authority to enact program amendments.

We are fortified in this conclusion by the realization that, unlike the situation in *Bowen*, where the contractual right to withdraw from the system was repealed entirely, RIHEAA's rights to reinsurance payments were not unilaterally terminated by the statutory change. Those rights remained intact, albeit on altered terms. Therefore, the plaintiff's contractual entitlement to stipendiary reimbursement was not abrogated by the 1987 amendments; it was simply conditioned on compliance with the excess reserve provisions. We believe that such a distinction has considerable importance in constitutional terms. *See, e.g., Sinking Fund Cases*, 99 U.S. at 721 (Congress "cannot undo what has already been done, and it cannot unmake contracts that have already been made, but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into.").

The sockdolager, of course, is that while the Act may be silent on reserved power, the contracts executed between the Secretary and RIHEAA speak volumes. Those agreements state repeatedly, and in the plainest language, that the agency's rights will be subject to "all changes in the Act or regulations in accordance with their respective effective dates." As a matter of contract alone, then, RIHEAA was on clear notice that the Secretary had reserved the right to superimpose subsequent statutory amendments on the preexisting contractual arrangements between the parties. And the Secretary's construction of the Act as authorizing such clauses, being plausible and consistent with the statutory text, deserves deference. *See, e.g., Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 403–04, 107 S.Ct. 750, 759–60, 93 L.Ed.2d 757 (1987); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 & n. 14, 104 S.Ct. 2778, 2782 & n. 14, 81 L.Ed.2d 694 (1984); *Massachusetts Dept. of Educ. v. United States Dept. of Educ.*, 837 F.2d 536, 541 (1st Cir.1988).

To be sure, the courts that have preceded us, although reaching a common destination, have taken two divergent roads. The Seventh and Eighth Circuits, *see respectively Great Lakes Higher Educ. Corp.*, 911 F.2d at 16–17; *Education Assistance Corp.*, 902 F.2d at 628–30 & n. 19, appear to rest their holdings entirely on principles of constitutional law and statutory construction, according little or no significance to the language contained in the guaranty agency's contracts with the Secretary. *See, e.g., Education Assistance Corp.*, 902 F.2d at 629 n. 19 ("We are not convinced ... that an agency, without any direction from Congress, may reserve the right to alter the terms of its agreements with private individuals."). The Sixth and Fourth Circuits, on the other hand, point to the conditional language in the contracts as one of the key factors indicating that the right to reimbursement is not a vested one. *See respectively Ohio Student Loan Comm'n*, 900 F.2d at 902; *South Carolina State Educ. Assistance Auth.*, 897 F.2d at 1276–77.

We believe that the latter approach is in greater alignment with the analysis set forth in *Bowen*. There, the Court first looked to the Social Security Act itself to determine whether Congress conferred a vested right, and, finding none, then examined the language of the contract executed pursuant to the Act to see whether, despite the emendatory reservation contained in the Act, the government had nevertheless committed itself to the point where the State had acquired a property interest. *Bowen*, 477 U.S. at 52–55, 106 S.Ct. at 2396–98. Unlike the Eighth Circuit, *Education Assistance Corp.*, 902 F.2d at 629 n. 19, the Court in *Bowen* did not differentiate between the government *qua* Congress (conferring a right through legislation) and the government *qua* federal agency (conferring a right through contracts);[4] and we, consistent with *Bowen* and with the approach favored by the Sixth and Fourth Circuits, see no need to do so here. Thus, we follow the course exemplified in *Ohio Student Loan Comm'n*, 900 F.2d at 901–02, and in *South Carolina State Educ. Assistance Auth.*, 897 F.2d at 1276–77, and place due weight on the language contained in the parties' several written agreements.

We need not paint the lily. "Regulation of property rights does not 'take' private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed." *United States v. Locke*, 471 U.S. 84, 107, 105 S.Ct. 1785, 1799, 85 L.Ed.2d 64 (1985). So here. An alteration such as occurred in this situation was in no way tantamount to the abrogation of a vested contractual right. We hold that the 1987 amendments to the Higher Education Act, and the "reserve transfer" provision created thereby, could constitutionally be superimposed on RIHEAA's right to obtain reimbursement on loans which it had guaranteed before, as well as after, OBRA's effective date.

4. *See Bowen*, 477 U.S. at 52, 106 S.Ct. at 2397 ("[C]ontractual arrangements, including those to which a sovereign itself is a party [federal agency], 'remain subject to subsequent legislation' by the sovereign [Congress].") (citation omitted).

## III. RIHEAA'S ENTITLEMENT TO A WAIVER

We move next to the district court's alternative holding that, apart from any constitutional infirmity, the Secretary "acted arbitrarily and contrary to law in denying RIHEAA's waiver request." *RIHEAA I*, 749 F.Supp. at 427.

### A. The Relevant Circumstances.

We start by elucidating in some detail the circumstances under which RIHEAA requested successive waivers of the Secretary's directives that it remit surplus reserves. We recount the facts as they appear in the administrative record.

On February 16, 1988, the Secretary informed RIHEAA that it was required to transfer $6,740,725 in excess cash reserves to DOE. Within the month, RIHEAA applied for the first waiver, claiming financial hardship and stating, *inter alia*, that it was contractually bound to participating lenders to "maintain a reserve of cash or marketable securities of at least 1% against the unpaid principal of all outstanding loans." According to RIHEAA's waiver application, this commitment translated into a required reserve of no less than $2,240,000. The application did not allude, directly or indirectly, to the PLUS program or to any arrangements with RISLA.

The Secretary denied the requested waiver on October 20, 1988. He concluded that RIHEAA had shown neither a significant deterioration in its financial position nor a sufficient change in economic circumstances since the end of fiscal 1986. The Secretary noted, as a point of emphasis, that the agency's total reserves had actually increased between 1986 ($9,995,388) and 1987 ($10,097,270). Accordingly, the Secretary denied relief under subsections (i) and (ii), respectively, of section 1072(e)(3)(A). These determinations have not been seriously challenged. They were, and are, clearly supportable.

On a more controversial plane, the Secretary also found that RIHEAA was not entitled to a waiver under section 1072(e)(3)(A)(iii). In this regard, he acknowledged that the lender agreements submitted with the waiver application required RIHEAA to maintain a reserve of cash and/or marketable securities equalling not less than 1% of the aggregate principal balance of its guaranteed loans, and that, as RIHEAA contended, $2,240,000 was needed to satisfy this obligation. Nevertheless, the Secretary referred to figures showing that the plaintiff's reserves for fiscal 1987 were in excess of ten million dollars, and remarked the obvious: "This amount is greater than [RIHEAA's] contractual reserve requirement and excess cash reserves requested ($2,240,000 plus $6,740,725)." That being so, the demanded transfer of monies "would not compel [the] agency to violate the contractual obligations to lenders to maintain a specified level of reserve funds."

Despite the denial of its waiver request, RIHEAA stubbornly refused to part with any lucre. Not to be outdone, the Secretary stated that he would withhold reinsurance payments otherwise due until the full amount of the putative debt was recovered. On October 27, RIHEAA shifted gears, mounting a new waiver initiative. It informed the Secretary that the financial statements it had previously submitted were incorrect. Because the Secretary's "calculations were apparently based solely on [RIHEAA's] 1986 and 1987 [financial] reports," and the reports were erroneous, RIHEAA contended that the Secretary's determination of the excess reserve amount was "grossly overstated." RIHEAA promised to provide the Secretary with amended reports and asked that any setoff be deferred until new data could be assembled and examined. The Secretary invited RIHEAA to submit corrected figures, but declined to defer action.

RIHEAA submitted its revised financial statements for 1986 and 1987 on January 4, 1989. According to the neoteric reports, the agency's cash reserve was $6,885,096 on September 30, 1986 (as opposed to $9,995,388, as stated earlier) and $4,513,343 on September 30, 1987 (as opposed to $10,097,270, as stated earlier). Based on the recast numbers, RIHEAA requested that the Secretary reconsider his prior calculation of an excess reserve amount. At the same time, RIHEAA petitioned for a second waiver, this time on a new and different ground:

> RIHEAA is required to maintain a 2% reserve based on its agreements with the Rhode Island Student Loan Authority executed in 1981 ... and thus was required to have $6.2 million in reserve on September 30, 1986 and $6.4 million in reserve on September 30, 1987. Since RIHEAA's reserves ... were $6,885,096 on September 30, 1986 and $4,513,343 on September 30, 1987, RIHEAA, in fact, does not have any "excess cash reserves."

At the time of this second waiver request, no mention was made of the loan contracts requiring RIHEAA to maintain a 1% reserve.

The Secretary responded to both of RIHEAA's beseechments on February 2, 1989. He granted the agency's first request, agreeing to "treat the corrected data as if it had been available when the original decision was made." Using those figures, the Secretary recalculated the excess reserve amount to be $2,785,156. With respect to the new waiver request, the Secretary temporized. He pointed out that RIHEAA had "not provide[d] any details of the contract" which allegedly required the 2% reserve, and invited RIHEAA to come forward with any and all information germane to this topic.

RIHEAA responded on February 9, submitting two agreements which, on their face, obligated it to maintain a 2% reserve. Both agreements ran to the benefit of RISLA.[5] While mentioning that these contracts were "in addition to the Agreements to Guarantee Loans ... previously sub-

---

**5.** Subsequent to this submission of February 9, 1989, but prior to the Secretary's final decision on May 26, 1989, RIHEAA submitted another agreement, between it and a lender participating in the PLUS program, containing a similar obligation.

mitted," RIHEAA predicated the new waiver request solely on the 2% requirement.

On March 22, the Secretary replied. He informed RIHEAA that it had failed to "provide[ ] the information needed to evaluate its claims regarding contractual obligations." The Secretary asked for documentation regarding the nature of RIHEAA's relationship with the signatories of the 2% reserve contracts. And the Secretary asked RIHEAA a pointed question: "Has RIHEAA ever provided any reports to lenders or secondary markets regarding its cash reserves?" The Secretary's query was followed by a request to transmit copies of any such reports. RIHEAA replied to the Secretary's question on May 3, 1989. It supplied no further documentation. Its executive director wrote:

> RIHEAA has not transmitted the corrected reports to the lenders or secondary markets since the [DOE's] acceptance of the corrected reports [on March 22, 1989]; thus there would be no reason for the lenders or secondary market to further question our reserves.

The Secretary rendered his final decision on May 26. He denied RIHEAA's second waiver request for two reasons. First, the plaintiff "did not provide any evidence that lenders or the secondary market monitored or enforced the two percent reserve provision...." Second, RIHEAA's revised figures indicated that it was already in breach of the 2% reserve requirement during 1987 and 1988; therefore, requiring the agency to pay over reserve funds would not compel it to violate these obligations. *Cf., e.g.,* W. Shakespeare, *Henry IV*, Part III ("[a] man can die but once").

### B. *Procedural Posture.*

In its complaint for judicial review of agency action,[6] RIHEAA attempted to assert seven statements of claim. The first five counts outlined assorted challenges to the Secretary's application of the 1987 amendments. Our earlier discussion of the

amendments' operation makes it clear that these five statements of claim were unavailing. *See supra* Part II. The sixth count raised a procedural due process question, not pressed in subsequent proceedings. Thus, the "waiver denial" challenge must derive its sustenance from count 7.

Count 7 challenged the October 20, 1988, denial of RIHEAA's first waiver request as "arbitrary ... capricious ... an abuse of discretion ... and ... not in accordance with law." Nowhere in this statement of claim did RIHEAA take issue with the Secretary's May 26, 1989, denial of its second waiver request. This was understandable as an initial matter, since the complaint was drafted and filed in January 1989, *see supra* note 6, before the second waiver request was determined. What is less understandable is that, after the second request was denied in May of 1989, the complaint was never amended to encompass that development. To make matters fuzzier, the district court, for reasons not immediately apparent from the appellate record (but likely at the parties' behest), ignored the Secretary's denial of the first (properly pleaded) waiver request, and instead concentrated on the second (unpleaded) waiver request.

We pause on the threshold to state our concern over the lack of attention paid by the parties to the failure to plead the issue now presented for appellate review. Having paused, however, we proceed. The appellants have not assigned error to this omission on appeal, and we, like the court below, can only treat the pleadings as having been amended through the parties' silence to conform to the arguments advanced and to the proof (including supplementation of the administrative record). *See* Fed.R.Civ.P. 15(b); *see also Lynch v. Dukakis,* 719 F.2d 504, 508–09 (1st Cir. 1983) (the test to determine consent to amendment by implication is whether a party objected to the introduction of evidence particular to the new issue and whether a party would be prejudiced by such amend-

---

6. The plaintiff's action was commenced by a complaint filed in the district court on January 9, 1989. On January 30, 1989, the plaintiff amended its complaint. *See* Fed.R.Civ.P. 15(a) (permitting party to "amend the party's pleading once as a matter of course before a responsive pleading is served"). Consequently, our discussion centers on the amended complaint.

ment). Because there is no suggestion that any of the parties objected to the trial court's consideration of the second waiver request, and because appellants have never argued that they were prejudiced by the absence of more artful pleading, we deem the issue to have been adequately raised.

## C. *The Second Waiver Request.*

■ Judicial review of the Secretary's denial of the waiver is governed by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which authorizes a court to set aside an agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This standard of review is a generous one. Absent mistake of law, reversal will lie only if the Secretary's action lacked a rational basis. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). We review *de novo* the district court's ruling that the Secretary erred in denying RIHEAA the waiver that it sought. *See Education Assistance Corp.,* 902 F.2d at 622.

■ We believe that, insofar as the second waiver request implicated the 2% reserve requirement, the Secretary was plainly warranted in denying it on the basis of RIHEAA's unwillingness to furnish relevant information. The district court, which determined that the Secretary had an insufficient basis for concluding that the 2% requirement was purely cosmetic, seems to have fitted the shoe to the wrong foot. The court reasoned that because both RIHEAA and its lenders had reason to believe before the audit that RIHEAA's reserves were ample, the lack of monitoring was explicable. *See RIHEAA I,* 749 F.Supp. at 426. Yet the court apparently failed to weigh a crucial fact: although RIHEAA told the Secretary that its prior financial statements were erroneously inflated, it did not notify its lenders of this development. Under those circumstances, it was not irrational to suspect that RIHEAA had effectively adopted a double-edged approach to its financial dealings: endeavoring to appear the pauper to the federal sovereign in order to avoid an excess reserve transfer, but playing the aristocrat to its lenders in order to eschew enforcement proceedings. Whether or not this was the plaintiff's actual motive seems immaterial; what matters is that the Secretary did not act arbitrarily or capriciously when he demanded further evidence of RIHEAA's relationship with these lenders. *Cf. Poole v. Freeman United Coal Mining Co.,* 897 F.2d 888, 893 (7th Cir.1990) ("[A] reviewing court may not set aside an ALJ's inference merely because it finds another more reasonable or because it questions the factual basis."); *United States Retail Credit Ass'n, Inc. v. F.T.C.,* 300 F.2d 212, 221 (4th Cir.1962) ("An inference made by an administrative agency may not be set aside upon judicial review because the court would have drawn a different inference.").

The stage being set in that fashion, RIHEAA's stonewalling rings down the curtain. It is unquestioned that the Secretary appropriately demanded the production of "pertinent information" regarding the agreements in question. It is equally beyond cavil that the Secretary never received the substantiation which he sought. As a regulated entity, RIHEAA bore the burden of proving its entitlement to a waiver. *See, e.g., Ashland Exploration, Inc. v. F.E.R.C.,* 631 F.2d 817, 823 (D.C.Cir.1980). Heedless of this burden, it ignored the regulator's timely request for unprivileged information relevant to the subject of regulation. Under such circumstances, the regulated entity can hardly complain if the regulator chooses to draw an adverse inference from the failure to produce. *Cf., e.g., Commonwealth of Massachusetts v. United States,* 856 F.2d 378, 383 (1st Cir.1988) ("Agencies are permitted to adopt and apply presumptions if the proven facts and the inferred facts are rationally connected."); *Wright Memorial Hosp. v. N.L.R.B.,* 771 F.2d 400, 404 (8th Cir.1985) (" '[I]t has long been settled that an agency's conclusions based upon ... inferences should not be set aside by a reviewing court unless they transgress the bounds of reason.' ") (quoting *Catholic Medical Center v. N.L. R.B.,* 620 F.2d 20, 22 (2d Cir.1980)). The

Secretary did not err in denying a waiver request premised on the 2% reserve obligation.[7]

■ Sustaining the Secretary's rejection of the 2% reserve requirement does not completely solve the puzzle. The district court also berated the Secretary for disposing of the second waiver petition without addressing RIHEAA's 1% reserve obligations. *RIHEAA I*, 749 F.Supp. at 424. If the latter issue had been confronted, the district court believed, a waiver would necessarily have resulted. *Id.* Using data for fiscal 1988, the court reasoned that transferring $2,785,156 in cash would have left a balance of only $712,320 in the reserve account—a sum considerably below what was needed to meet the 1% requirement. *Id.* at 423–24.

On appeal, the Secretary argues that the issue of whether RIHEAA would have been compelled to violate its 1% reserve obligations was not properly raised in the course of the second waiver request. The district court gave this argument short shrift, but we think it has some substance. For one thing, RIHEAA did not expressly raise the issue of its 1% reserve obligations at any time after its first waiver request was denied on October 20, 1988. For another thing, the plaintiff's later submittal of recast financial information altered the contours of the playing field in a highly material respect. As RIHEAA itself argued, once the Secretary accepted the new figures, all of the Secretary's prior calculations became obsolete. It does not seem unreasonable, therefore, that the Secretary might construe RIHEAA's second waiver request as self-contained, i.e., a new and independent application based on the revised data, reasonably expecting that any issues RIHEAA wanted considered in light of that data would be explicitly raised.

On the other hand, we are troubled by the Secretary's bland assumption that he had no duty to consider the loan agreements that contained the 1% reserve requirement. Copies of these contracts were already in the Secretary's possession and acceptance of the new figures did not alter their terms. Moreover, it seems somewhat unrealistic for the Secretary to assume, without further inquiry, that RIHEAA's intense focus on the issue of its 2% reserve obligations implied that it was foregoing any other arguments in support of the second waiver request—especially a previously-documented argument of exactly the same genre as the "2% reserve" argument. Though the plaintiff asked for the full (2%) loaf, there was no good reason to suspect that, if push came to shove, the plaintiff would not have considered half a loaf (1%) as better than no loaf at all.

Faced with this paradox, we do not fault the district court for concluding that the Secretary should have passed upon the 1% issue. We think that a regulator, charged with the responsibility of determining whether certain funds should be retained by a state agency or transferred to federal coffers, ought to display some reasonable liberality in interpreting waiver requests so as to achieve fairness and effectuate congressional intent. In short, the 1% reserve issue, although not raised with classic precision, was arguably "raised with sufficient specificity and clarity" to warrant administrative consideration. *Wallace v. Department of the Air Force*, 879 F.2d 829, 832 (Fed.Cir.1989).

We find the district court's next decision—that a waiver was exigible on this ground, *RIHEAA I*, 749 F.Supp. at 424–25—much less palatable. The Secretary, at the very least, should have been afforded the initial opportunity to address RIHEAA's 1% reserve obligations in connection with the second waiver request. A remand should have been ordered.

7. Insofar as the plaintiff's waiver argument prescinded from its obligations to RISLA, it strikes us as somewhat disingenuous. Although not mentioned by the Secretary, we take judicial notice of the fact that RISLA and RIHEAA operate with firmly interlocked boards of directors, such that the appointed members of RIHEAA's board, who constitute a majority of its directors, *see* R.I.Gen.Laws § 16–57–7(a), serve *ex officio* as the only members of RISLA's governing board, *see* R.I.Gen.Laws § 16–62–7(a). In reality, then, the 2% reserve requirement, to the extent that it depended on RIHEAA's commitment to RISLA, was self-imposed.

■ Our holding in this respect is animated by two interconnected rules of administrative law. The first rule counsels that a reviewing court, having determined that an administrative agency did not consider all the relevant factors, should ordinarily remand the matter to the agency rather than compensating for the agency's oversight by launching a free-wheeling judicial inquiry into the merits. *See, e.g., Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam); *Thompson v. United States Dept. of Labor,* 885 F.2d 551, 555 (9th Cir.1989).

■ The second rule to which we make reference explains the basis for the first rule. It is apodictic that a reviewing court should accord an agency's decision considerable deference when that decision involves a technical question within the field of the agency's expertise. *See Lile v. University of Iowa Hospitals and Clinics,* 886 F.2d 157, 160 (8th Cir.1989) ("[W]here the agency's specialized knowledge is involved and Congress has vested the agency with discretion in a technical area, the court should grant broader deference and uphold the agency's conclusion if the conclusion is rationally based."); *Building and Const. Trades Dept., AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C.Cir.1988) ("When called upon to review technical determinations on matters to which the agency lays claim to special expertise, the courts are at their most deferential."); *see also Constance v. Secretary of HHS,* 672 F.2d 990, 995–96 (1st Cir.1982) ("Where Congress is silent, common sense suggests that the less important the question of law, the more interstitial its character, the more closely related it is to the every day administration of the statute and to the agency's administrative or substantive expertise, the less likely it is that Congress wished the courts to remain indifferent to the agency's views."). This principle has been applied to matters of finance and accounting, both in fields unrelated to today's inquiry, *see, e.g., Cheshire Hosp. v. New Hampshire–Vermont Hospitalization Serv., Inc.,* 689 F.2d 1112, 1117 (1st Cir.1982), and, specifically, to "the arcane world of GSLP financing." *Citizens Savings Bank,* 605 F.Supp. at

1041. It follows, we think, that the more imbricated a matter, the more cautious a reviewing court should be about attempting to resolve the issue itself, rather than remanding to the agency. And in this case, RIHEAA's entitlement *vel non* to a section 1072(e)(3)(A)(iii) waiver falls squarely in the maw of the Secretary's presumed expertise.

Nor would a remand be an empty exercise here. Without attempting to exhaust the scenarios, we sketch two possibilities. First, as the Secretary has pointed out, the lender contracts calling for a 1% reserve allowed that reserve to consist of "cash or marketable securities." Yet, the recast financial reports were unilluminating as to the presence or absence of marketable securities, and RIHEAA, in connection with the second waiver request, never furnished the Secretary with any information concerning the value of its marketable securities. Thus, absent further factfinding, it cannot be stated with any assurance whether the transfer-of-funds directive would have run afoul of the reserve obligations contained in those agreements. Second, just as RIHEAA's apparent withholding of its corrected financial reports from RISLA and the PLUS lenders had evidentiary force, *see supra* pp. 855–856, how RIHEAA dealt with the lenders whose contracts required a 1% reserve might well bear on the merits of the waiver request.

We need go no further. Especially where, as in this case, the administrative record has not been fully developed, a reviewing court should hesitate to speculate about matters which should have been, but were not, addressed by the agency. Here, mindful that Congress has vested administration of the GSLP in the Secretary, and that the entire array of relevant factors underlying the waiver question were not duly considered, we think that the second waiver request should have been remanded for further consideration.

## IV. CONCLUSION

For the reasons discussed above, we conclude that the district court erred both in

858

concluding that the 1987 amendments to the Higher Education Act unconstitutionally abridged RIHEAA's contractual right to receive reinsurance payments and in finding that RIHEAA's second waiver request should have been honored. We believe, however, that the section 1072(e)(3)(A)(iii) waiver request must be more fully explored at the administrative level. Hence, we remand to the district court with instructions that it, in turn, remand the waiver issue to the Secretary for further proceedings consistent herewith. The Secretary will be free, of course, to request any additional information regarding the 1% contracts, or RIHEAA's finances, as he deems necessary to place these obligations, and their legal effect, into proper perspective.

*Reversed in part, vacated in part, and remanded. Costs in favor of appellants.*