**Ricardo NATER–LEBRON, Pedro Jose Farina–Abo, Plaintiffs,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**Civil No. 00–1765 CCC.**

United States District Court, D. Puerto Rico.

Oct. 20, 2000.

Luis R. Pérez–Giusti, Mignucci & Pérez–Giusti, for Plaintiffs.

Sheila M. Lieber, Deputy Director, Glen Staszewski, Trial Attorney, Federal Programs Branch, Civil Division, U.S. Department of Justice, Guillermo Gil, U.S. Attorney, José M. Pizarro–Zayas, Assistant U.S. Attorney, Washington, DC, for Defendant.

### ORDER

CEREZO, District Judge.

Plaintiffs are patients of the Cardiovascular Center of Puerto Rico and the Caribbean who are on a waiting list to receive

heart transplants. They challenge as arbitrary and capricious the Final Rule and Performance Standards set forth in the May 2, 1996 Final Rule for Medicare and Medicaid Programs: Conditions of Coverage for Organ Procurement Organizations (OPOs), 61 Fed.Reg. 19,721 (1996). On April 18, 2000, Lifelink of Puerto Rico, the OPO for the Puerto Rico service area, received a notice of decertification from the Department of Health and Human Services for failure to achieve compliance with the requirements for OPO participation in the Medicaid program. Termination as an OPO in the Medicare and Medicaid program was to be effective August 1, 2000. This termination schedule was voluntarily modified to preserve rights pending conclusion of the judicial review.

Pursuant to federal regulations, beginning on January 1, 1996, an OPO must achieve at least 75 percent of the national mean for four of the following five performance categories, averaged over the 2 calendar years before the year of redesignation: number of actual donors per million population, number of kidneys recovered per million population, number of extrarenal organs recovered per million population, number of kidneys transplanted per million population, and number of extrarenal organs transplanted per million population. *See* 42 C.F.R. § 486.310(b). Pursuant to 42 C.F.R. § 486.310(c)(1), an exception based on location was established for Puerto Rico and non-contiguous territories. This less stringent performance standard required that Lifelink of Puerto Rico, as an OPO, reach 50% of the national average for kidneys recovered per million and kidneys transplanted per million. The Puerto Rico service area was opened to new applicants. During the pendency of this litigation, two OPOs are competing for this service area.

The parties agreed that there was no need to hold an evidentiary hearing and that the case be adjudicated based on the motion for summary judgment and cross-motion for summary judgment filed by

defendant (docket entry 26) and plaintiffs (docket entry 33) respectively, the administrative record (A.R.) and the exhibits attached to their motions. The Court's order on defendant's motion in limine (docket entry 39) excluded evidence extraneous to the administrative record. The Court has not deemed it necessary to obtain from the agency additional information or explanations of the reasons for the decision it took during the rule-making process.

We must first address plaintiffs' allegation that defendant exceeded Congressional authority by promulgating a performance standard based strictly on population factors. They specifically refer to Senate Report 101–530 of the Senate Labor and Human Resources Committee, 101 Cong.2d Sess. 22 (1990) *reprinted in* 1990 U.S.C.C.A.N. 4625, 4641 (Exhibit 10 to the Amended Complaint, docket entry 54), in which the Committee, with reference to the Transplant Amendment Act of 1990, Pub.L. No. 101–616, expresses its expectation that the Secretary would promulgate standards which would serve to promote effectiveness and efficiency among OPOs. The Committee noted that a standard of retrieving a specified number of organ donors per million population would not, by itself, satisfy those requirements. This is the sole reference made by plaintiffs in support of the argument that the agency exceeded the Congressional grant of authority and enacted overreaching regulations.

The Court in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), observed that the determination on whether the agency acted within the scope of its authority "begins with a delineation of the scope of the Secretary's authority and discretion." In our case, the statutory mandate on the fixing of standards for organ procurement agencies is contained in 42 U.S.C. § 1320b–8(b)(1)(C) which provides, among other requirements, that the Secre-

tary shall provide payment to an organ procurement agency only if it meets "performance-related standards prescribed by the Secretary." Notwithstanding the comments in the Senate Report in the sense that a standard based only on demographic data could not achieve the goals of efficiency among OPOs, the Transplant Amendment Act of 1990 did not define any particular subject matters which the agency had to address and include in the promulgation of OPO performance standards. It did not establish any limitation or prohibition as to what factors the agency could consider in setting the standards. Indeed, other alternatives to the population-based standards were suggested and considered. The reasons for the non-adoption at the time were explained by the Secretary and are found in the record of the rule-making process.

Plaintiffs argue as if Congress had expressly prohibited the agency from considering the population-based factor. The comment on which plaintiffs build their entire argument of defendant's alleged contravention of Congressional authority is merely an admonition that the population-based standard, standing alone, would fall short of achieving effective performance by OPOs. The rule-making process in this particular area commenced in 1991, led to the issuance of an interim rule, and continued until 1996 with the adoption of the final rule. The rule-making record reflects that the Secretary did not act beyond the powers delegated to her. It reflects, rather, a lengthy and detailed rule-making process during which reasonable explanations were provided for adopting a population-based standard. The fact that the population data was not combined with other factors based on non-demographic data, given the practical realities and the difficulties confronting the agency in defining a workable standard, does not mean that defendant flaunted the will of Congress. At the time that Congress delegated upon the agency the authority to enact this rule, neither Congress nor the agency knew the issues that would arise, the alternatives that would be proposed, the information relevant to those alternatives or which of the suggested alternatives would ultimately fit the Congressional objectives in a viable manner.

We must now determine whether the agency's analysis throughout the rule-making process and its final decision-making culminated in a rule which withstands challenge under the parameters set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). This provision establishes the "arbitrary and capricious" standard of review invoked by plaintiffs. Describing the standard of review as a "narrow one" in *Overton Park*, 91 S.Ct. at p. 824, the Court indicated that to make a finding that the agency's choice was not arbitrary and capricious, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*, at pp. 823–24. Trial courts were admonished that, although they must conduct a careful and in-depth review, they are "not empowered to substitute [their] judgment for that of the agency." *Id.*, at p. 824. These constraints were followed by the Court of Appeals for the First Circuit in *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (Cir.1997), where the Court said that "policy choices are for the agency, not the court, to make", and that "[e]ven if a reviewing court disagrees with agency's conclusions, it cannot substitute its judgment for that of the agency." Earlier, in *R.I. Higher Educ. v. Sec'y, U.S. Dept. of Educ.*, 929 F.2d 844, 855 (1st Cir.1991), the Court referred to the arbitrary and capricious standard of review as "a generous one" and observed that "[a]bsent mistake of law, reversal will lie only if the Secretary's action lacked a rational basis." *See also State of Me. v. Kreps*, 563 F.2d 1052, 1055 (1st Cir.1977). Citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983), the Court

of Appeals in *Associated Fisheries* gave examples of what constitutes a lack of a rational basis: "if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." 127 F.3d at p. 109. The reviewing court must ensure that the agency's decision is "founded on a reasoned evaluation of the relevant factors." *N.L.R.B. v. Beverly Enterprises–Massachusetts*, 174 F.3d 13, 24 (1st Cir.1999) (*citing Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

In their cross-motion for summary judgment, plaintiffs claim that defendant overlooked relevant factors in adopting a population-based performance standard. This, they contend, renders the Final Rule arbitrary and capricious. They refer generally to a "myriad of factors" (Cross-motion for summary judgment, docket entry 33, at p. 26) that impact organ donor potential and which render the standard adopted inappropriate. The particular factors pointed out as relevant yet disregarded refer to the average age of persons in the service area, their overall health and their educational level, number of hospital deaths, number of trauma centers and transplant programs in the area, racial composition of the population and refusal to consent to organ donations. Plaintiffs claim that defendant's failure to incorporate these factors is not excused by the fact that they were internally evaluated and rejected. The rule-making record convinces us that the deaths-per-year formula was not arbitrarily discarded. Although recognizing that this was a "more targeted measure of an OPOs actual potential donor pool, upon surveying the availability of death data, the agency reported the problems confronted by OPOs in obtaining timely data." *See* 61 Fed.Reg. 19,734. As discussed later, this same difficulty is reported by the General Accounting Office in its November 1997 Report on Alternatives Being Developed to More Accurately Assess Performance of OPOs (GAO Report), (Exhibit 13 to the amended complaint, docket entry 54), which indicated that the mortality statistics of the National Center for Health Statistics (NCHS) were incomplete and had a two-year lag.

Defendant is correct in asserting that the claim that consideration of these factors may have resulted in a more precise measure of OPO performance does not translate into a finding that the Secretary's decision lacks a rational basis or that she used improper factors that Congress did not intend the agency to consider. As stated before, the one admonition in Senate Report 101–530 that a population-based standard by itself would be insufficient does not mean that considering the population-based datum was improper. As a matter of fact, the Association of Organ Procurement Organizations recommended, despite its flaws, the continued use of the population-based standard. As plaintiffs' own information reflects, alternative standards based on number of deaths to define potential donor supply is not free of deficiencies or difficulties either. Plaintiffs make no attempt, as defendant points out, to establish that there was one superior formula which made the adopted performance standard arbitrary and capricious. Aside from providing a laundry list of factors which they deem relevant, there is no attempt to establish what priority would be given to these several factors in working out a standard that measures performance of an entity in the procurement of organs. This case is distinguishable from *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto., Inc. Co.*, 103 S.Ct. at 2869–71, where the agency did not consider at all the airbag alternative before abandoning the mandatory passive-restraint rule.

Plaintiffs also contend that there is no empirical evidence to support the agency's decision. Again, we agree with defendant that the agency made an impact analysis

and that there was no empirical evidence at the time that would advise against the adoption of the population-based standard as a reasonable measure. The rule-making record reflects the multiple and varied responses submitted to the agency on suggested performance standards by the medical community and the public at large. These comments demonstrate the complexity confronted by the agency in formulating standards of performance in this area. The administrative record shows that due consideration was given to multiple concerns. The degree of detail and varying opinions posed a challenge which was not ignored but rather acknowledged by the Secretary. Specific reasons were provided for the decision not to adopt certain criteria and particular proposals which were submitted at the time. Cognizant of the complexity of the problem and the need to evaluate the experience of the OPOs once the standards were in place, defendant repeatedly stated that it was open to reexamine the standards adopted as to their accuracy.

As we discussed later, the debate continues as to the degree of precision of the various alternatives to measure OPO performance to achieve the goal of maximizing their resources and effectiveness. Administrative rules are not written in stone. The fact that revisiting this subject matter may in the future result in the adoption of a standard based on factors other than population alone does not mean that the choice made in 1996 by the Secretary, in the exercise of her discretion, was arrived at in an irrational or whimsical manner. As stated in *Associated Fisheries*, 127 F.3d at p. 111, "[w]hether or not we, if writing on a pristine page, would have reached the same set of conclusions is not the issue ... [w]hat matters is that the administrative judgment, right or wrong, derives from the record, possesses a rational basis, and evinces no mistake of law." If it does, the administrative decision must be approved under the applicable standard of review.

Plaintiffs refer to the Battelle Study which is a part of the administrative record, at p. 656, as lending support to its theory that the factors outlined above are relevant considerations. It also contends that such study is critical of the methodology adopted by defendant in promulgating the performance standards. The Battelle Study is a paper on the potential supply of organ donors prepared by the Battelle–Seattle Research Center, dated June 1991, which reports their attempts "to develop a geographic organ donor database whereby county, regional, state, and national estimates of potential supply can be derived ... [and] ... then used to assess the efficiency of organ procurement efforts at both the OPO and the state level." A.R., at p. 666. Pursuant to its analysis, efficiency was defined as "the percentage of potential donors that become actual donors, when measured across a single geographical entity." A.R. at p. 671. Although describing its approach as less costly than death record review studies, and despite their claim that their method brings consistency to the evaluation process of OPOs, the Research Center acknowledges that "[c]oncern over the precision of our estimates is warranted." A.R. at p. 684.

It is not correct, as plaintiffs point out, that this study is critical of the methodology adopted by the Health Care Financing Administration (HCFA) in the performance standards. The methodology adopted by the agency in its Final Rule did not occur until 1996, and this is a 1991 research. Furthermore, the study itself refers to HCFA only with reference to the 50 actual donor rule, cautioning that such rule should be carefully considered before implementing it. Plaintiffs know well that the 50 actual donor rule is not an issue since the same was abandoned.

Finally, the best evidence that the Final Rule should not be stricken as arbitrary and capricious was submitted by plaintiffs themselves: the GAO Report. While questioning the population-based standard

adopted by HCFA because it does not account for variations in demographic and other factors that can affect the organ donation rates of OPOs, including causes of death, that report clearly states that the alternative standard that it promulgates which uses number of deaths as a basis is only "slightly more suitable than using population as a standard." GAO Report, at p. 17.

Expanding on this, the report states, at page 18, that "[b]ecause only a fraction of those who die make acceptable organ donors, using number of deaths as a standard provides only a gross measure of the number of potential donors." The report, therefore, made an adjustment on the number of deaths-based standard to take into account cause of death and age in order to better estimate the number of potential donors. This formula has its drawbacks, as recognized at pages 19–20 of the GAO Report. Noting that adjusted cause of death data are a subset of the National Center for Health Statistics (NCHS) mortality statistics, the report states that "these data have completeness and timeliness limitations." GAO Report at p. 19. As a matter of fact, at page 17 of the report it states that "Puerto Rico . . . do[es] not submit data to NCHS" and that the mortality data submitted by others is not available for a period of two years. It is acknowledged that this two-year lag results in comparing the number of deaths for incomparable time periods. This "may skew the results of this type of analysis." GAO Report at p. 18. The report also recognizes that its definition "does not include in-hospital deaths, a requisite for organ donation" and that the data obtained from centers such as NCHS "do not reveal enough information to accurately identify deaths with organ donation potential because data on a patient's social history and medical conditions ruling out organ donation are missing." GAO Report, at p. 20. Finally, the report acknowledged a drawback of using adjusted death data which was noted by HCFA in rejecting this alternative. This drawback is related to the resources required by OPOs such as computers and staff resources to compute the number of adjusted deaths in their service areas. GAO Report, at p. 20.

Plaintiffs claim that they have been decertified as poor performers because of the stringent and arbitrary measures adopted by defendant which made compliance virtually impossible. The 1997 GAO Report submitted by them indicates, however, that more OPOs would have been subject to termination under one or the other of the two standards proposed as alternatives to the population-based standard. This report reflects an on-going effort to evaluate the best methods for determining the number of potential donors for an OPO. It is a recognition of the many considerations that are a pat of such an evaluation, reasonable cost of the measure being one of them.

All of the formulas have their strengths and their weaknesses. Although identification of potential donors using death data has been a recurring theme, recommended as an important factor in assessing performance, the multiple aspects, datum and inquiries triggered by this denominator have precluded the common ground of the discussion to crystalize into a concrete norm or standard to measure OPO performance nationwide. This possibility is fraught with uncertainty and burdened by its own complexities. There was not, at the time of the adoption of the challenged rule, a wealth of evidence, as plaintiffs contend, in support of this particular alternative as a feasible defined measure which was arbitrarily rejected by the Secretary in favor of a capricious, illogical one.

SO ORDERED.