**MAINE STATE BOARD OF ED-UCATION, et al., Plaintiffs, Appellants,**

v.

**Lauro F. CAVAZOS, in his Official Capacity as Secretary of Education, Defendant, Appellee.**

No. 91–1538.

United States Court of Appeals, First Circuit.

Heard Oct. 8, 1991.

Decided Feb. 13, 1992.

Jeffrey Frankel, Asst. Atty. Gen., with whom Michael E. Carpenter, Atty. Gen., and H. Cabanne Howard, Deputy Atty. Gen., were on brief for plaintiffs, appellants.

Richard A. Olderman, Atty., Appellate Staff, Civil Div., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Richard S. Cohen, U.S. Atty., and William Kanter, Atty., Appellate Staff, Civil Div., Dept. of Justice, were on brief for defendant, appellee.

Before BREYER, Chief Judge, TORRUELLA, Circuit Judge, and WOODLOCK,* District Judge.

BREYER, Chief Judge.

The basic question in this appeal is whether or not the United States Department of Education ("DOE") acted arbitrarily, 5 U.S.C. § 706(2)(A), in 1983 when it refused to reimburse the Maine State Board of Education (the "Board") for certain administrative expenses related to a federal student loan program. Like the district court, we conclude that the facts, viewed in the light most favorable to the Board, show that DOE's actions were reasonable, hence lawful, and we affirm the district court's grant of summary judgment for DOE.

## I

### *Background*

From 1977 through 1982, DOE reimbursed the Board for administrative expenses incurred in operating a "guaranteed student loan program." In December 1982, a DOE auditor found that the Board had contracted with a private organization (United Student Aid Funds or "USAF") to administer the program. The auditor noted

that the relevant federal statutes authorized reimbursement of administrative expenses "incurred" by a "guaranty agency," such as the Board. 20 U.S.C. § 1078(f)(1)–(2) (1976 and 1980 versions). But, the auditor concluded that USAF, *not the Board,* had "incurred" the expenses in question. Consequently, in 1983, DOE ordered the Board to return the reimbursements, and the Board did so.

In 1987, Maine state auditors decided that the DOE auditor had been wrong, and, in 1989, the Board filed this lawsuit to recover the $1.7 million it had previously returned to DOE. The district court found the Board's legal arguments unconvincing, and it granted summary judgment for DOE. We conclude that the district court was correct. To understand why, the reader must take account of the following background.

### A

### The Federal Guaranteed Student Loan Program

The federal guaranteed student loan program encourages lending by private banks to students by subsidizing interest rates and guaranteeing repayment. Three legal features of the program are significant here.

First, the federal program works through 1) the payment of federal interest subsidies to participating banks that lend money to students, 20 U.S.C. § 1071, and 2) the repayment, by the federal government, of defaulted student loans. 20 U.S.C. §§ 1078(a), (c)(1), 1078–1 (1976 and 1980 versions) (providing for federal reinsurance of loans that state "guaranty agencies" insure).

Second, state "guaranty agencies" (sometimes public, sometimes private) administer the student loan programs. For example, they advertise the program to banks; they reimburse banks for student defaults; and they try to collect defaulted loans from students. The federal statutes also authorize reimbursements to state

---

* Of the District of Massachusetts, sitting by designation.

"guaranty agencies" for many of their administrative expenses. 20 U.S.C. § 1078(f) (1976 and 1980 versions).

Third, the relevant, and complicated, federal statutes and regulations embody two similar sounding (but, in fact, quite different) concepts which produced confusion in this case. The first concept is called a "guarantee fee." Federal law permits the guaranty agency to charge banks a "guarantee fee" that the agency can use to help pay for loan insurance and also to "cover costs incurred" in administering the program. 45 C.F.R. §§ 177.401(b)(12) (1979), 177.6(b) (1975); *see also* 20 U.S.C. § 1078(b)(1)(H). The banks normally pass this charge along to student borrowers.

The second concept is called an "administrative cost allowance" (or "ACA"). The statutes authorize DOE to reimburse a guaranty agency for qualified administrative costs that the agency has "incurred." 20 U.S.C. § 1078(f)(1)–(2) (1976 and 1980 versions).

The confusion arises because the laws impose, upon each of these two different sources of administrative cost recovery, a similar ceiling, namely 1% of the face value of the guaranteed loans. They create a "1% guarantee fee," and they also create a "1% ACA reimbursement." Thus, in principle, a guaranty agency that guaranteed, say, $10 million of student loans, could receive repayment for qualified administrative costs up to $200,000. It could receive up to $100,000 in "ACA reimbursement" directly from DOE, and it could receive another $100,000 from the "guarantee fee" that it can charge banks (and, ultimately, students).

B

The Relevant Events

The important events in this case, for purposes of this appeal, are the following:

1. Between 1968 and 1978, the Board entered into agreements with DOE that qualified the Board for ACA reimbursement.

2. In 1968, the Board agreed with USAF that USAF would administer most of the loan program (*e.g.*, advertising the loan program, processing loan applications, trying to collect defaulted loans, etc.). The Board agreed to pay USAF for these administrative services by allowing USAF to collect, and permitting USAF to keep, the *1% guarantee fee* that federal law permitted the Board to charge participating banks (and which they passed on to students). The contract said that this "fee charged students will be retained" by USAF.

3. Each year, USAF sent the Board a list of its administrative expenses. USAF did not expect the Board to send it reimbursement, for USAF *already* was receiving money to cover these expenses in the form of the 1% guarantee fee. The Board added a few expenses of its own to the list, and it sent the combined list to DOE as *ACA-reimbursable* administrative expenses. DOE automatically paid the requested amount (up to the 1% ACA ceiling). Between 1977 and 1983 (the relevant period for this lawsuit), DOE paid the Board, as ACA, a total of $1.9 million, of which $1.4 million represented the administrative expenses that USAF reported to the Board.

4. In December 1982, a DOE auditor examined the Board's books. He found that the Board had credited all the ACA money received from DOE to a separate ACA account. The account showed offsetting debits for expenses related to the administrative activities the Board itself undertook. But the account showed *no offsetting debit* for USAF's expenses. That is not surprising, for, as we have said, the Board did not send DOE money to USAF; it paid USAF by permitting USAF to keep the 1% guarantee fee. The auditor concluded that USAF's administrative expenses did not qualify for ACA reimbursement. DOE told the Board it must return this money.

5. In an effort to rebut the auditor's conclusions, USAF sent DOE's regional administrator a copy of a letter it sent to the Board. In that letter, USAF explained that the Board, *in effect*, had paid for USAF's administrative expenses by permitting USAF to keep the 1%

guarantee fee that otherwise the Board could have collected and kept itself. USAF said that the "economic reality is that these costs have actually been incurred and should form the basis for a valid claim under ACA...."

6. DOE's regional administrator did not accept USAF's argument. He wrote that the

Administrative Cost Allowance is intended to reimburse a portion of the expenses incurred by the [Guaranty] Agency in administering its student loan program. It, therefore, is not possible to have a net ACA cash balance, after proper reconciliation of the account, and still be in compliance with the intended purpose of ACA. The Federal Government must be reimbursed....

7. In July 1983, the Board told DOE, "we agree with the findings of [the DOE auditor] and we do not wish to pursue further attempts to seek any reconsideration." The Board then paid back the money, $1.4 million in ACA plus $300,000 in interest.

As we have said, in 1987, Maine state auditors decided that the DOE auditor was wrong, and, in 1989, the Board brought this lawsuit. The Board lost on a motion for summary judgment, and it now appeals.

### C

### Jurisdiction

■ The parties have argued at length about whether or not the Board's initial agreement with the audit and repayment order, along with the passage of time, bars the Board from bringing this lawsuit. The Board says that its claim meets statutory requirements and, thus, there should be no bar. Federal statutes explicitly give the federal courts power to hear this kind of claim. 20 U.S.C. § 1082(a) ("with respect to the functions, powers, and duties, vested in him by this part [setting forth the guaranteed student loan program], the Secretary [of Education] may ... sue and be sued ... in any district court"). The Board sued within the six year time period set forth in the general federal statute of limitations governing civil actions, 28 U.S.C. § 2401(a); thus, this suit is timely and proper.

DOE replies that, if the Board treats this suit as an ordinary civil action arising under the Guaranteed Student Loan Program statutes, doctrines of estoppel or laches bar the suit. *See, e.g., K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 911–12 (1st Cir.1989). DOE adds that, if, to escape these doctrines, the Board characterizes the suit differently (say, as a breach of contract suit), then it is suing in the wrong court, and must, or should be required to, sue in the United States Claims Court instead. 28 U.S.C. § 1491(a) (Tucker Act). *But see Ohio Student Loan Commission v. Cavazos,* 900 F.2d 894, 898 n. 1 (6th Cir.) (Tucker Act inapplicable where guaranty agency sought declaratory and injunctive relief concerning Secretary's repayment order under "excess cash recovery" provision in guaranteed student loan program statutes), *cert. denied,* ––– U.S. –––, 111 S.Ct. 245, 112 L.Ed.2d 203 (1990).

We believe that the Board has stated a claim that falls within the jurisdictional statute that it cites. Whether or not the Board's delay, or DOE's reliance on the Board's earlier statements, somehow triggers non-jurisdictional doctrines (such as estoppel) that warrant dismissal is a matter we need not decide, for we decide, in any event, in DOE's favor. That is to say, in our view, DOE's arguments about the merits of the case are legally correct, and the merits present far simpler questions of law. Hence, we shall not consider DOE's arguments on the estoppel or laches questions. *Cf. Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976); *United States v. Parcel of Land With Building, Appurtenances, Etc.,* 928 F.2d 1, 4 (1st Cir.1991); *Caribbean Transp. Systems, Inc. v. Autoridad de Las Navieras,* 901 F.2d 196, 197 (1st Cir. 1990); *Kaiser v. Armstrong World Industries, Inc.,* 872 F.2d 512, 514 (1st Cir.1989).

### II

### *The Lawfulness of DOE's Repayment Order*

■ The Board claims that DOE's reimbursement disallowance was arbitrary, 5

U.S.C. § 706(2)(A), or violated the federal statutes that authorize reimbursement, 20 U.S.C. § 1078(f)(1), (2) (1976 and 1980 versions). In considering these claims, we begin with the following four propositions. First, agencies normally require grantees seeking reimbursement to identify specifically the expenses for which they wish to be reimbursed. *See, e.g.,* 20 U.S.C. § 1078(f)(1)(B), (2)(B) (1976). Second, federal agencies, trying to administer billion-dollar grant programs, without loss and waste, normally require grantees to follow reasonable accounting principles and reporting practices when, for example, they identify those reimbursable expenses. *See, e.g.,* 20 U.S.C. §§ 1078(f)(4) (1976 and 1980 versions), 1082(a)(3); 34 C.F.R. § 682.-407(a)(2)(iii), (b)(2); *cf. Hennepin County v. Sullivan,* 883 F.2d 85, 91 (D.C.Cir.1989) (Lack of "sufficient evidence to demonstrate 'separately identified' excess costs incurred" is grounds for denial of "costs exception" under Medicare regulation.), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). Third, the statutes in question here permit ACA reimbursement only for administrative expenses "incurred" by a "guaranty agency." 20 U.S.C. § 1078(f) (1976 and 1980 versions). Fourth, as the parties concede, the Board is a "guaranty agency," but USAF is not.

These four propositions ineluctably lead us to uphold DOE's decision as lawful. The particular $1.4 million in expenditures that the Board identified for reimbursement were USAF's expenditures, not the Board's expenditures. The auditor found that the Board's accountants held DOE's ACA reimbursements in a separate account with no offsetting expenditures—a fact that suggests the Board itself did not incur the expenditures matched to those reimbursements. The Board's explanation confirmed the DOE auditor's views, for the Board told DOE that USAF had incurred the specific, matched expenditures. USAF's letter added further confirmation, for it said that the Board had "agreed to pay USAF a servicing fee equal to the full amount of the guarantee fee" for engaging in administrative activity—a statement that indicates that the *servicing fee (i.e.,* the 1%

guarantee fee, not the specific matched USAF expenditures) constituted the administrative expenses that the Board "incurred."

Ordinary English adds yet more support to DOE's view: Suppose a householder agrees to pay a gardener $10 to mow his lawn, and the gardener spends $2 for lawn-mower oil. One would normally say the householder "incurs" an expense of $10, and the gardener "incurs" an expense of $2. One does not ordinarily think of the $2 as an expense "incurred" by the householder. We can find nothing in the statutes, regulations, or caselaw that would prevent DOE from interpreting the statutory word "incurred" in just this way. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Nor can we find anything unreasonable or arbitrary about DOE's determining reimbursement eligibility, under such an interpretation, by looking to the specific, account-book-identified expenses for which the agency requests reimbursement. *See, e.g., Memorial Hospital v. Heckler,* 706 F.2d 1130, 1134–35 (11th Cir.1983) (Secretary may choose any reasonable accounting procedure, consistent with statutes and regulations, for calculating hospitals' reimbursable costs under Medicare program.), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984); *cf. HCA Health Services of Midwest, Inc. v. Bowen,* 869 F.2d 1179, 1181 (9th Cir.1989) (Even in absence of promulgated regulations, Secretary may apply "generally accepted accounting principles.").

The Board makes several arguments to the contrary. First, it says that the contract between the Board and USAF makes USAF the Board's "agent" for administering the loan program, and that this agency relationship makes USAF's expenses those of the Board. The contract, however, does not make USAF the Board's "agent" in any way that is relevant here. The contract does not make the Board liable for USAF's debts, and it does not say that the Board will reimburse USAF for USAF's administrative expenses. Rather, it simply says

that the Board will pay a single fee for all of USAF's services. That fee may (or may not) prove sufficient to cover USAF's expenses, but, for the reasons set forth above, it does not mean that the Board "incurred" them.

■ Second, the Board argues that DOE should have reimbursed the Board for some, or all, of the 1% guarantee fee that the Board assigned to USAF as a "service fee." The short, conclusive answer to this argument is that the Board *did not request* reimbursement for that particular "expense." The closest thing to such a request that we find in the record is a June 1983 protest letter that USAF sent to the Board, with a copy to DOE. That letter says:

> The accounting records ... apparently do not reflect the servicing fee paid to USAF as an expense, but the economic reality is that these costs have actually been incurred and *should form the basis for a valid claim for ACA* ....

(Emphasis added.) A suggestion made in a copy of a letter from USAF to the Board that the fee *"should form the basis for ... a claim"* is not a *claim by the Board to DOE for reimbursement.*

■ We understand that to say this is to affirm DOE's right to stand upon form and to insist upon a fairly literal reading of books of account and requests for reimbursement. But, we believe the law gives agencies this freedom. *Cf. Memorial Hospital,* 706 F.2d at 1134–35. It is normally reasonable for an agency administering a large grant program to insist upon punctiliousness in money matters, applying rather strict accounting principles, to prevent fraud, to prevent waste, and to help understand, and thereby to evaluate, program operation. The facts of this case help illustrate why this is so.

Suppose that the Board had asked DOE from the beginning, "Please reimburse us, not for USAF's administrative expenses, but, rather, for the 1% guarantee fee that we paid USAF for its services." We cannot be certain that DOE would have done so, or would have done so in the same amounts that the Board, in fact, requested.

The 1% guarantee fee, in respect to each particular loan, was to reimburse USAF for costs it incurred, for example, in trying to collect the loan if the student defaulted. Such costs might, or might not, have arisen in the year USAF received the 1% fee. Thus, the total of USAF's ACA-type administrative costs in any given year might, or might not, have matched the total 1% guarantee fees it collected in that year. And, DOE might, or might not, have accepted the Board's or USAF's efforts to pro-rate, and thereby to match, fees and expenses. We cannot tell because (as far as we can see from the record) the Board never clearly explained these matters to DOE.

Moreover, if the Board had formally asked DOE to reimburse it for all, or part, of the foregone 1% guarantee fee, DOE might have considered whether, or the extent to which, the Board was foregoing income that it could otherwise keep. The loan program statutes and DOE regulations say that "insurance premiums" (such as the guarantee fee) shall not be "excessive." 20 U.S.C. § 1078(b)(1)(H); *cf.* 45 C.F.R. §§ 177.401(b)(12), 177.6(b) (1975). If other funds, such as ACA funds, paid most administrative costs, DOE might have insisted that the Board return some of the money to the students. At least, a clear request and records that clearly explained the matter would have enabled DOE to consider whether or not the 1% guarantee fee should have been put to the use that the Board made of it.

The fact that we cannot be certain what DOE would have said, had the Board's requests and books been clearer, is exactly why, in our view, the law permits DOE to proceed rather formally and literally in this financial matter, even though doing so may deprive the grantee of funds that "economic reality" suggests it ought to have. That is why we cannot say that DOE's decision is unreasonable or arbitrary.

Third, the Board seems to say that DOE acted arbitrarily because 1) the Board's giving up the 1% guarantee fee, and 2) USAF's administrative expenses, were really the same thing. Hence, the Board's request for ACA to cover USAF's expenses

really *was* a request for a portion of the foregone guarantee fee—an expense that the Board did "incur" when it assigned the fee to USAF.

■ The problem with this argument is that no one listening to the Board at the time could have understood it to be making such a request. Maine state auditors, writing in 1986, described the events of 1982–1983 as follows:

When the federal review was done, the reviewers saw no recorded offsetting costs and questioned the apparent excess ACA payments received to costs incurred. [Maine] Department [of Educational and Cultural Services] personnel apparently did not fully understand, and were therefore unable to explain to the reviewers, that this balance actually represented a legitimate State accumulation of federal reimbursements for earlier (unrecorded) State expenditures of the 1% insurance premium fees.

If Maine personnel at the time "did not fully understand" the matter, if they were "unable to explain to the reviewers" the identity of the expenditures, how could any court say that DOE was unreasonable in finding that the two were not the same? Nor did DOE act unreasonably in failing to reopen the matter in light of the Board's later, fuller explanation, for that explanation came several years after the Board had agreed to accept the DOE auditor's determination and the matter had long been closed.

Fourth, the Board points out that, after 1983, it obtained DOE reimbursement for USAF's administrative expenses. To do so, it simply changed a few words on paper, writing a new contract under which USAF holds the 1% guarantee fee in a fund for the account of the Board, while the Board separately reimburses USAF for its expenses. The Board argues that, since the economic reality of its relationship with USAF is the same, DOE's position on ACA reimbursement should not differ. Here, we can only repeat our view that the form does make a difference and that an agency normally does not act unreasonably in financial matters when it relies upon ac-

countants and when it goes by the books. The Board's new formal arrangements with USAF permit DOE's accountants readily to trace, and to understand, the substance of the Board's transactions; the old arrangements did not.

■ We have not held that DOE could not lawfully have reached a different conclusion. An agency has considerable leeway in applying general statutory instructions concerning such matters of administrative detail as reimbursing the administrative costs grantees "incurred." *See Chevron*, 467 U.S. at 848–49, 864–66, 104 S.Ct. at 2784–85, 2792–93; *Mayburg v. Secretary of Health & Human Services*, 740 F.2d 100, 106 (1st Cir.1984); *Constance v. Secretary of Health & Human Services*, 672 F.2d 990, 995–96 (1st Cir.1982); *see also Rhode Island Higher Education Assistance Authority v. Secretary, U.S. Dept. of Education*, 929 F.2d 844, 857 (1st Cir.1991). If the Board had negotiated further with DOE, if it had explained more carefully what had occurred, it might have overcome DOE's accounting-based objections and obtained some kind of reimbursement. The Board did not protest the auditor's report, however. It told DOE's regional administrator that it "agree[d]" with the auditor and did "not wish to pursue" the matter "further." And, as we have said, we can find nothing unreasonable in DOE's actions or evaluations up to that time, or in DOE's subsequently taking the Board at its word.

Finally, we note that the Board appeals the district court's refusal to supplement the record with certain documents. In reaching our decision, we have reasoned as if those documents had been admitted and said what the Board says they say. We do not believe anything in those documents could change our result. Reading the record, with or without those documents, in the light most favorable to the Board, we conclude that DOE's determination was not arbitrary or otherwise unlawful. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106

S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); *Space Master Int'l, Inc. v. Worcester,* 940 F.2d 16, 17 (1st Cir.1991).

For these reasons, the judgment of the district court is

*Affirmed.*