The CONNECTICUT STUDENT LOAN
FOUNDATION, Plaintiff,

v.

Richard RILEY and United States
Department of Education,
Defendants.

No. 3:93 CV–2570 (JBA).

United States District Court,
D. Connecticut.

Oct. 29, 1996.

Ralph G. Elliot, Tyler Cooper & Alcorn, Hartford, CT, for plaintiff Connecticut Student Loan Foundation.

William A. Collier, U.S. Attorney's Office, Hartford, CT, Shelia Lieber, Pamela Eppli, U.S. Department of Justice, Washington, DC, for defendants Richard Riley, U.S. Dept. of Education.

ARTERTON, District Judge.

Upon careful review and pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 2 of the Local Rules for United States Magistrates (D.Conn.1994), this well-reasoned recommended ruling is APPROVED and ADOPTED as the ruling of this Court, absent any objection filed.

IT IS SO ORDERED.

*RECOMMENDED RULING ON PLAIN-TIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS THE COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT*

MARTINEZ, United States Magistrate Judge.

This is a declaratory judgment action brought by the Connecticut Student Loan Foundation ("CSLF") against the United States Department of Education and its Secretary (collectively, the "Secretary"). CSLF challenges the Secretary's interpretation of changes made to 20 U.S.C. § 1078(b)(1)(G) by the Student Loan Reform Act of 1993, Pub.L. 103–66 Title IV, Subtitle A. Specifically, CSLF seeks a declaration that the statute gives it discretion to guarantee student loans at any rate between 98 and 100% despite the Secretary's promulgation of regulations requiring CSLF to insure loans only at 98%.

CSLF has moved for summary judgment. The Secretary has moved to dismiss the complaint for lack of standing or, in the alternative, for summary judgment. For the reasons stated below, the court recommends that the plaintiff's motion for summary judgment and the defendants' motion to dismiss the complaint be DENIED and that the de-fendants' motion for summary judgment be GRANTED.

## I. *BACKGROUND*

The Guaranteed Student Loan Program, 20 U.S.C. § 1071 *et seq.*, was enacted as part of the Higher Education Act of 1965 to encourage lending by private banks to students by providing federal subsidies on interest rates and federal guarantees for repayment. *Maine State Bd. of Educ. v. Cavazos,* 956 F.2d 376, 377 (1st Cir.1992). Any state wishing to allow its students to obtain federally guaranteed loans must either establish a state guaranty agency or designate a private nonprofit guaranty agency to administer the loans. 20 U.S.C. § 1078(b)(1)(K). CSLF is a private, nonprofit corporation created by the State of Connecticut for that purpose.

The Guaranteed Student Loan Program works in three basic steps: (1) private lenders (usually banks) are authorized to make low-interest loans to eligible students; (2) the guaranty agency guarantees the loans by the private lenders; and (3) the Department of Education reinsures the loan by reimbursing the guaranty agency for all or part of their expenses in covering student defaults for private lenders. 20 U.S.C. § 1078(a)–(c). The rate at which the federal government reimburses the guaranty agency for defaults varies between 78%, 88% and 98% according to the guaranty agency's default rate. *Id.*

A guaranty agency's functions include advertising the program to banks, reimbursing banks for student defaults and collecting defaulted loans from students. *Maine State Bd. of Educ.,* 956 F.2d at 377–78. In order to perform its role, a guaranty agency maintains "reserve funds." 34 C.F.R. § 682.410. Reserve funds consist of funds received from a variety of sources including collections from students on defaulted loans and reimbursements made to the agency by the federal government. 34 C.F.R. § 682.410(a)(2). By law, all money deposited in the reserve funds is the property of the United States, 20 U.S.C. § 1072(g), and may only be used for student loan program purposes as directed by the Secretary, 34 C.F.R. § 682.410(a)(2).

The Secretary not only has ultimate control over the reserve funds, but also has

ultimate control over the guaranty agency's loans. If a guaranty agency's reserve funds are inadequate and placing the agency in danger of insolvency, or if the Secretary believes it is necessary to protect the government's fiscal interest, the Secretary may take over any or all of a guaranty agency's loans. 20 U.S.C. §§ 1078–9(c)(8) & 1082(*o*).

To participate in the program, all guaranty agencies are required to enter into several agreements with the Secretary in which the agency promises, among other things, to conform both to the existing federal statutes and regulations and to abide by new obligations that Congress or the Secretary might impose in the future. *See* Exhibits 2 & 3 to Defendants' Memorandum in Support of Its Motion to Dismiss Or, in the Alternative, for Summary Judgment; 20 U.S.C. § 1078(b); 34 C.F.R. § 682.400 *et seq.*

Pursuant to its agreements with the Secretary, a guaranty agency's failure to comply with any provisions of its contract or applicable law or regulations may result in the Secretary's withholding of reimbursements on defaulted loans. In addition, civil penalties may be imposed where the guaranty agency "has violated or failed to carry out any provision of this part or any regulation prescribed under this part. . . ." 20 U.S.C. § 1082(g).

Originally, the Higher Education Act required guaranty agencies to insure "not less than 100 percent of the unpaid principal of loans insured under the program." 20 U.S.C. § 1078(b)(1)(G) (1965). The requirement changed in 1993, when Congress amended the statute. The amendment provided that 98 percent be substituted for 100 percent. The statute now requires guaranty agencies to insure "not less than 98 percent of the unpaid principal of loans insured under the program." The amendment also added an exception to the "not less than 98 percent" insurance requirement. The exception provides that guaranty agencies "shall insure 100 percent of the unpaid principal of loans" made by certain lenders to students who

were considered to be at high risk of default. *See* 20 U.S.C. § 1078(b)(1)(G).

The Secretary interpreted the amendment to mean that guaranty agencies had to insure lenders at 98%, not more and not less. This interpretation was initially conveyed to the guaranty agencies by a letter dated November, 1993. New federal regulations published on November 30, 1994 codified this interpretation by requiring that "[t]he guaranty agency shall guarantee . . . [n]ot more than 98 percent of the unpaid principal balance of each loan guaranteed for loans first disbursed on or after October 1, 1993." 34 C.F.R. § 682.401(b)(14) (as amended by 59 F.R. 61424, 61428).[1]

At oral argument CSLF represented that it has abided by the Secretary's regulation and has insured lenders at 98%.

## II. *DISCUSSION*

### A. *The Motion to Dismiss: Standing*

■ The first question raised is whether CSLF has standing to bring this declaratory judgment action. The Secretary argues that CSLF does not have standing to challenge the Secretary's interpretation of the 1993 amendments because CSLF cannot be injured by the Secretary's regulation.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry . . . is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Limits are imposed upon the court's jurisdiction in order to avoid judicial decisions on abstract questions of public significance where other governmental institutions might be more competent to address the questions and where the court's intervention is unnecessary to protect individual rights. *Id.* at 500, 95 S.Ct. at 2205–06.

A three-pronged test is used to determine standing. First, a plaintiff must show that

---

1. The promulgation of this regulation moots CSLF's argument that the Secretary's November 1993 letter was not binding on guaranty agencies because it was not procedurally valid under the

Administrative Procedure Act (see footnote # 2 of Plaintiff's Memorandum of Law in support of its motion for summary judgment).

he has suffered an injury in fact that is both concrete in nature and particularized to him. Second, the injury must be traceable to the defendant's conduct. Third, the injury must be redressable by removal of the defendant's conduct. *In re U.S. Catholic Conference,* 885 F.2d 1020, 1023–24 (2d Cir.1989) (citations omitted), *cert. denied,* 495 U.S. 918, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990). The party invoking federal jurisdiction bears the burden of establishing that it has standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992).

The Secretary argues that CSLF can sustain no economic injury by its implementation of the Secretary's interpretation because a guaranty agency has no ownership interest in the reserve fund; pursuant to 20 U.S.C. § 1072(g), the fund is the property of the United States government. The Secretary further argues that even if CSLF had an interest in the reserve fund, it can sustain no economic injury. In support of this latter argument, the Secretary points out that by limiting the amount paid to lenders on defaulted loans to 98%, the loss to the reserve fund is reduced by up to 2%. By reducing losses to the reserve fund, the 98% limit on loan guarantees helps, rather than hurts, CSLF's economic interests.

CSLF asserts that it has a potential economic injury because the Secretary may refuse to reinsure CSLF's losses if it fails to abide by any statute or regulation. The Secretary replies that because CSLF has no property interest in the reserve fund, it cannot be harmed by such a sanction but, even if CSLF did have a property interest, CSLF cannot manufacture an injury by its own actions (citing *Petro–Chem Processing Inc. v. EPA,* 866 F.2d 433, 438 (D.C.Cir.), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989) and *Doremus v. Board of Educ.,* 342 U.S. 429, 435, 72 S.Ct. 394, 397–98, 96 L.Ed. 475 (1952)).

Even if CSLF has no interest in the reserve fund which would establish standing, standing exists on other grounds. CSLF has standing because civil sanctions pursuant to 20 U.S.C. § 1082(g) may be imposed on CSLF if it fails to abide by the Secretary's regulations. The threat of civil sanctions is an injury caused by the Secretary's actions and redressable by a declaratory judgment. *See Cramp v. Board of Pub. Instruction,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961) (where threat of prosecution over failure to sign loyalty oath fulfilled standing requirement); *Kidder Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556 (2d Cir.), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2829, 115 L.Ed.2d 998 (1991) (where threat of litigation against party seeking declaratory judgment satisfied standing requirement); *Kamasinski v. Judicial Review Council,* 797 F.Supp. 1083, 1088 (D.Conn.1992) (Cabranes, J.) (where threat of punishment for breaches of confidentiality statute was sufficiently real to establish standing). For these reasons, the Secretary's motion to dismiss the complaint for lack of standing should be DENIED.

### B. *Summary Judgment*

The court now turns to the question of summary judgment. Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In these cross motions for summary judgment, the parties agree that there are no disputed issues of fact. They present only an issue of statutory interpretation, and therefore this case is ripe for summary disposition. *See, e.g., Luyando v. Grinker,* 8 F.3d 948, 950 (2d Cir.1993).

### 1. *The Law of Statutory Interpretation*

■ The issue before the court is one of statutory interpretation—whether the statutory provision directing guaranty agencies to insure student loans at "no less than 98%" permits the Secretary's regulation requiring the insurance of student loans at 98%, no more and no less. In reviewing a federal agency's interpretation of a statute, the court must resolve two questions:

First, always, is the question whether Congress has spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the

court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted). Thus, although "the power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress," *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974), where the statute is unambiguous no agency interpretation need take place. *E.g., Withey v. Perales*, 920 F.2d 156, 158 (2d Cir.1990). An administrative agency's adoption of a regulation is unjustified when that regulation is at odds with the clear intent of the statute. *See New York City Health and Hospitals v. Perales*, 954 F.2d 854, 858 (2d Cir.), *cert. denied*, 506 U.S. 972, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992).

To answer the first question, whether the statute addresses the issue in dispute, the court must look both to the particular statutory language at issue and to the language and design of the entire statute. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988) (citing *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 403–05, 108 S.Ct. 1255, 1258–59, 99 L.Ed.2d 460 (1988); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220–21, 106 S.Ct. 2485, 2493–94, 91 L.Ed.2d 174 (1986)). Although a statutory provision might appear to address an issue clearly when that provision is read in isolation, the provision might be ambiguous when read in the context of the statute as a whole. For instance, in *Offshore Logistics, Inc. v. Tallentire*, the Supreme Court held that a provision of the Death on the High Seas Act which "at first blush" appeared to incorporate any state wrongful death statute in fact did not do so when that provision was "evaluated in light of the language of the Act as a whole, the legislative history of [the provision], the congressional purposes underlying the Act, and the importance of uniformity of admiralty law." 477 U.S. at 220–21, 106 S.Ct. at 2493.

Similarly, in *Chemical Mfrs. Ass'n v. Natural Resources Defense Council*, the Supreme Court refused to give a literal interpretation to a 1977 amendment to the Clean Water Act which "on its face" forbade the Environmental Protection Agency from amending its own standards. 470 U.S. 116, 125–26, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985). The Supreme Court held that it made "little sense" in the context of the statute as a whole to forbid the agency from amending its own standards and because such a reading would contradict another provision of the statute which expressly required the agency to revise certain standards from time to time to reflect changes in technology or operating methods. *Id.*

■ Where a statute is found to be ambiguous, the court must then determine if the federal agency's regulation is a permissible construction of the statute. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82. Great deference is given to the federal agency administering the statute to reasonably interpret the statute and adopt regulations to implement the statute based on the legislative intent. *E.g., National R.R. Passenger Corp. v. Boston and Maine Corp.*, 503 U.S. 407, 417–18, 112 S.Ct. 1394, 1401–02, 118 L.Ed.2d 52 (1992); *Chevron*, 467 U.S. at 843–45, 104 S.Ct. at 2781–83. This deference is given despite the fact that other reasonable interpretations may exist or that the court might have reached a different construction had the agency not acted. *Chevron*, 467 U.S. at 843, n. 11, 104 S.Ct. at 2782, n. 11; *Maine State Bd. of Educ.*, 956 F.2d at 382. Deference is particularly required when the "decision involves a technical question within the field of the agency's expertise. This principle has been applied to matters of finance and accounting, both in fields unrelated to today's inquiry and, specifically, to 'the ar-

cane world of [Guaranteed Student Loan Program] financing.'" *Rhode Island Educ. Assistance Auth. v. Secretary, U.S. Dept. of Educ.,* 929 F.2d 844, 857 (1st Cir.1991) (citations omitted).

### 2. *The Statute is Ambiguous*

CSLF argues that the language of the statute is clear—it gives guaranty agencies the right to insure lenders at any rate that is equal to or greater than 98%. According to CSLF, the language of the statute is not only clear on its face, it is clear in the context of the statute as a whole.

CSLF first argues that if Congress intended to mandate the 98% reimbursement rate, it would have done so explicitly. Such mandatory limitations using the language "shall be equal to" were employed elsewhere in the statute as part of the 1993 amendments to the Higher Education Act. *E.g.,* 20 U.S.C. § 1078(c)(1)(A) ("the amount to be paid to [a] guaranty agency ... *shall be equal to* 98%") (emphasis added); 20 U.S.C. §§ 1078(c)(1)(B)(i) and (ii). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972). *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). CSLF concludes that the existence of specific limitations elsewhere in the same statute makes the phrase "not less than 98%" clearly permissive, giving the guaranty agency the discretion to insure lenders at any rate from 98% to 100%.

The Secretary responds with two arguments. First, he argues that in the context of the statute as a whole, the amendment only makes sense if it imposes an upper limit of 98% as well as a 98% floor on the insurance that the guaranty agency gives lenders. According to the Secretary, the title of the amendment "Risk Sharing By Loan Holders" only makes sense if it actually imposes the risk on the lenders. The Secretary also argues that the existence of a statutory exception to the 98% insurance rate—that guaranty agencies must insure 100% of loans made by "lenders-of-last-resort" to the riskiest students pursuant to §§ 1078(j) and 1087–2(q)—suggests that the 98% insurance rate must be a ceiling as well as a floor. The court is unpersuaded by this argument. The amendment's title makes equal sense if the statute merely provides the option to impose risk sharing on lenders. Similarly, the fact that the amendment provides an exception to the 98% insurance rate does not conflict with the notion that Congress might have wanted flexibility in the amount of insurance given to lenders.

The Secretary's second argument is that even if the statute is read to provide some flexibility in imposing the risk of default on lenders, in the context of the statute as a whole, it would be illogical to read § 1078(b)(1)(G) as giving the guaranty agencies (rather than the Secretary) that discretion. This second argument is persuasive.

The Secretary accurately points out that because the statute provides no guidelines for adjusting the rate of insurance, giving the guaranty agencies the discretion to determine the rate of insurance could permit the disparate treatment of lending institutions by a single guaranty agency or bidding wars for lenders between guaranty agencies. Disparate treatment of lenders and bidding wars between agencies would undermine the statute's consistent and repeated efforts to create equal and open access to student loans. *See, e.g.,* 20 U.S.C. § 1071(a)(2) (prohibiting lenders from discriminating against students in making loans pursuant to the Higher Education Act); 20 U.S.C. § 1078(h)(3) (loans provided directly by the guaranty agencies to students under circumstances where no private lender can be found must have the same terms as all other loan agreements); 20 U.S.C. § 1078(b)(1)(U) (assuring fair treatment of all lenders by requiring guaranty agency to provide for the eligibility of lenders under criteria established by 20 U.S.C. § 1085(d)(1) and to limit, suspend or terminate a lender only under criteria "which are

substantially the same as regulations" issued by the Secretary); 20 U.S.C. § 1078(n)(4) (assuring fair treatment of all institutions of higher educations by allowing the states to collect fees from those institutions only if the states establish a fee structure approved by the Secretary).

The importance of uniformity and consistency in the administration of student loans was emphasized by the 1993 amendments to the Higher Education Act under 20 U.S.C. § 1082(*l*)(1)(G) which for the first time mandated that the Secretary prescribe standardized forms and procedures for, among other things, guarantee of loans. Indeed, the fact that the Secretary is endowed with the authority to prescribe all procedures for guaranteeing loans under this section undermines CSLF's argument that § 1078(b)(1)(G) gives discretion to the guaranty agencies to determine the rate of insurance of student loans.

The absence of guidelines for adjusting the rate of insurance under § 1078(b)(1)(G) is itself telling. At oral argument the Secretary stated that, for the most part, the statute specifically deprives the guaranty agencies of discretionary decisions and, to the limited extent the Higher Education Act gives the guaranty agencies discretion on any issue, standards are given for exercising that discretion. The Higher Education Act in fact provides excruciating detail for almost every aspect of student loans and repeatedly provides for criteria to be established by the Secretary where those guidelines are missing in the statute itself. In addition to the broad powers of the Secretary to regulate to carry out the purposes of the statute, 20 U.S.C. § 1082, many sections of the statute specifically call upon the Secretary to establish criteria for actions by the guaranty agencies.[2]

Under this statutory structure, Congress would not logically endow guaranty agencies with the discretion to commit federal funds. The Higher Education Act establishes a statutory scheme in which the federal fiscal interest is tied to the rate of insurance given to lenders. Examples of these ties are: the reserve funds out of which insurance over 98% would be paid are owned by the federal government (20 U.S.C. § 1072(g)); the federal government has to reimburse 78 to 98% of payments made to lenders pursuant to § 1078(b)(1)(G) (20 U.S.C. § 1078(c)(1)); and the Secretary has to take over any loan, if in his view it is necessary to protect the government's fiscal interest (20 U.S.C. § 1078(c)(8)). In light of these very substantial fiscal concerns and in the absence of any standards for adjusting the insurance rate, the statutory structure suggests that Congress did not intend to give the guaranty agencies discretion over the insurance rate.

Thus, despite the language of the amendment which, when read in isolation, could be construed to give the guaranty agencies discretion to adjust the insurance rate, the language and design of the statute as a whole suggests that guaranty agencies should not be given such discretion. Given these competing factors in statutory interpretation, this court finds that 20 U.S.C. § 1078(b)(1)(G) is ambiguous.

### 3. *The Regulation Reasonably Construes the Statute*

Having found the statute to be ambiguous, the court must next determine if the Secretary's interpretation of the statute is permissible. As previously discussed, the language and design of the statute logically suggests that the Secretary ought to have that discretion because the statute emphasizes fairness and uniformity in every aspect of the program, consistently vests discretion in the Secretary to fill voids left by the statutory language, and creates an impact on the federal fisc by any adjustment of the rate of insurance. In addition to those reasons previously discussed, the legislative history strongly suggests that the Secretary's regulation requiring the guaranty agencies to insure no more than 98% of loans is reasonable.

---

**2.** For example, the 1993 amendments changed § 1078(e)(1)(B) to require the Secretary to set standards for participation in a lender referral service. Similarly § 1078(b)(1)(U) requires the Secretary to adopt criteria for compliance audits of lenders and § 1078(n)(4) requires the Secretary to approve state fee structures, including waivers, for default fees imposed on schools. The clear purpose of these statutory criteria is to protect the federal fiscal interest.

The legislative history reveals that in 1993, while considering a proposal to abandon the current system of student loan financing and replace it with a system of loans made directly from the federal government to students, Congress criticized the profits of commercial lenders on student loans. The American Association of Community Colleges submitted a letter to Congress stating that "a 1992 Education Department study indicates that the student loan business was the second most profitable lending operation for banks, surpassed only by credit card lending." 139 Cong.Rec. S3639, 103d Cong., 1st Sess. (March 24, 1993). Senator Jeffords stated that "the subsidies paid by the Federal Government to encourage lenders to participate in a program to provide no-risk loans are far too costly." 139 Cong.Rec. S3637, 103d Cong., 1st Sess. (March 24, 1993). The Congressional Research Service, which had been requested by Congress to do an economic analysis of the proposed direct lending program, concluded that direct lending was not economical but that

> [i]f it is felt that lenders are receiving to (sic) much compensation, that can be dealt with without a switch to direct lending. The special allowance rate could be reduced or there could be some sort of risk sharing implemented (lender wouldn't receive a 100% guarantee on defaulted loans). Please consider though that lenders need some incentive to participate in the program.

139 Cong.Rec. S3636, 103d Cong., 1st Sess. (March 24, 1993).

When the proposal for direct lending ultimately failed, Congress attempted to address the problem of excessive profits by amending the Higher Education Act as the Congressional Research Service had suggested—by imposing risk sharing on lenders. The Senate originally voted to reduce the insurance to 95%, but the House had no equivalent provision, and the 98% rate was reached in conference. The Conference Report on the legislation describes the risk sharing amendment as providing "that all holders of loans be allowed 98% payment of defaulted loans from the guaranty agency or the Secretary, as appropriate, effective October 1, 1993.

Lender-of-last-resort loans would receive 100% insurance from the guaranty agency or the Secretary, as appropriate." H.Conf.Rep. No. 103–213, 103d Cong., 1st Sess. (August 3, 1993) reprinted in 139 Cong.Rec. at H5909 (August 4, 1993). On this record, the Secretary's regulation requiring an insurance rate of no more than 98% reasonably construes Congressional intent to impose risk sharing on lenders.

In sum, the Secretary's regulation requiring that guaranty agencies insure loans at 98%, no more and no less, is a permissible interpretation of the risk sharing provisions. The Secretary's motion for summary judgment should be GRANTED and CSLF's motion for summary judgment should be DENIED.

## III. CONCLUSION

For the forgoing reasons, the Court recommends that the plaintiff's motion for summary judgment (Doc. # 9) and the defendants' motion to dismiss the complaint (Doc. # 12) be DENIED and that the defendants' motion for summary judgment (Doc. # 12) be GRANTED.

Either party may seek the district judge's review of this recommendation. *See* 28 U.S.C. § 636(b) **(written objections to ruling must be filed within ten days after service of same)**; F.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 474–75, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992) **(failure to file timely objection to Magistrate Judge's recommended ruling waives any further judicial review of the ruling).**

Dated at New Haven, Connecticut this 27th day of September, 1996.